We have just one case on the docket this morning for oral argument. That case is Clause 22-3.06-08 Loretto v. O'Reilly v. Allstate Financial Companies. Is the appellant ready to proceed? You may. May it please the court, my name is Lisa Jordan and I'm here for the appellants. We've been here before, your honors. Twenty years ago, this November, the Corps issued a permit at this same site for a multi-use development and the Corps did not perform a cumulative impacts analysis. Though the Corps admitted then that it had issued 72 permits in a three-mile radius of the site that covered 18,000 total acres, 400 of which were wetlands, the Corps failed to, in this court's O'Reilly opinion, quote, consider the cumulative effects of the project, area urbanization, and permits issued to third parties, close quote. The appellants, some of whom are here today, bring this case to you because the Corps has failed again and they suffer the Corps' failures. They suffer from increasingly serious flooding, flooding that the appellants, their expert Dr. Koob, and FEMA all attribute to the widespread filling of wetlands in the Liberty Bayou Chufonta watershed. There are many other impacts that they suffer, noise, traffic, water quality, but the bottom line is that getting this wrong puts people at risk. The Corps owes legal duties to the public and it owes legal duties to this court. Under the Clean Water Act, it owes a duty to evaluate the impacts of a project to aquatic resources, including the cumulative impacts, and to protect those resources from damage, resources that the appellants rely on, Your Honors. Under NEPA, it owes duties to take a hard look at the impacts of the project, beyond those to aquatic resources, to include all impacts to the human environment. And to this court, it owes a duty to present a record that demonstrates that it followed the law, to explain and support its decision, to demonstrate that it didn't just process paper and check boxes. But instead here, the Corps' demonstration amounts to because we said so. Is the check box form that's included, I think at Table 9, something that is generally routine in these types of cases? Yes, Your Honor. They do the check mark boxes. There's more than, there's several tables of them. They did them in the Atchafalaya Basin Keeper case. The difference is they generally, when they are affirmed, they follow the tables with a discussion. There's no discussion here at all on any factor. Your Honor, the Corps wants deference without earning it or justifying it. And it wants deference despite issuing a decision in flagrant disregard of this court's 2007 ruling. Yet it's done even less to comply with NEPO than what this court deemed inadequate in 2007. In 2007, the Corps admitted that it issued 72 permits in the three-mile radius of the site. How many permits in this area has it issued since 2007, since 2003, in those 20 years? We have no idea because the Corps didn't talk about them at all. Now, doesn't the standard of review here is arbitrary and capricious? Yes, Your Honor. Well, that's a pretty high hurdle, isn't it? Yes, Your Honor. Arbitrary and capricious when the Corps, under the motor vehicle standard, when an agency entirely fails to consider an important aspect of the problem. And to our clients, this is... The cumulative impact is only one of ten factors. It is listed as only one of ten intensity factors, but it is separately, Your Honor, required under NEPA in 1508.8 and 1508.9. So the district court focused on its one of ten intensity factors, but it separately appears as a requirement in 1508.8 and 1508.9 as a requirement of an environmental assessment, not just an environmental impact statement. So it is not a minor issue, and it's particularly not a minor issue in a case like this, where the Corps has issued permit after permit after permit in the same area for impacts that can accumulate. Your Honors, this case actually exemplifies why the cumulative impact assessment requirement has been an essential component of both the Clean Water Act and NEPA for decades. It's based on the principle that an agency cannot determine whether a project will have a significant impact on the environment when it views the project in isolation. Your Honor, particularly not in a situation like this, again, where it's repeatedly issuing permits in the area. Three separate regulatory programs require that cumulative impact analysis. I'm going to focus the rest of my argument on the Clean Water Act. Mr. Moctezuma will address NEPA, and we'll rely on our briefs for the Corps' regulations, which also require, separately, a cumulative impacts requirement. The Clean Water Act's implementing regulations, the 404b1 guidelines, explicitly require a cumulative impact analysis. Section 230.11 of those guidelines lists the mandatory factual determinations that the Corps must make, and they include at paragraph G, quote, a determination of cumulative effects on the aquatic ecosystem, close quote. There is no exception in the regulations, and no party cites any case that excuses the Corps from conducting a cumulative impact analysis under the Clean Water Act under any circumstances. So the only question here is, did the Corps do a cumulative impacts analysis? And the record resoundingly and unequivocally demonstrates that the answer is no. The Corps did not analyze, quote, the changes in an aquatic ecosystem that are attributable to the collective effect of a number of individual discharges of dredge or fill material, which is the definition of cumulative impact in the guidelines. And the guidelines also say, although the impact of a particular discharge may constitute a minor change in itself, the cumulative effect of numerous such piecemeal changes can result in a major impairment. We put evidence before the Corps, Your Honor, that those piecemeal changes had occurred, and that a major impairment of the flood storage capacities also resulted. The Corps ignored that evidence. It ignored the FEMA study that we presented that assessed the March 2016 flooding that inundated this exact area, where FEMA laid out in detail just how many millions of dollars in damage was caused, and FEMA stated in that study, quote, the loss of wetlands contributes to both flooding and pollution. Close quote. It ignored our expert, Dr. Koob's, testimony, not mentioned anywhere in the decision document. And it ignored the testimony of Hazel Piazza, who's lived immediately across the street from this project since 1982, and who detailed how bad the flooding has gotten and how it occurs because the Little Chifuncta River overflows its banks when there's rains. That's how the flooding is happening. The Corps ignored all of this evidence. The Corps' litigation, I mean, yeah, the Corps' litigation council argues that all states' drainage study resolves all the flooding concerns. But this is post hoc rationalization. The Corps never said that in the record. The Corps does reference the study two or three times, but it is a drainage study. And the Corps references it as a drainage study. It addresses where will the rain that falls on these 70 acres of concrete drain to. It does not purport to address flooding, and it particularly does not purport to address cumulative impacts. The study only looks at this project and ignores everything that's going on around it. But it is the Corps' duty. I see my time is up, Your Honor. Thank you. May it please the Court. My name is Steven Moctezuma, student counsel for the appellants. And I'm going to argue that the Army Corps failed to comply with its required NEPA duties when it failed to consider the cumulative impacts of the Timber Branch 2 project. NEPA regulations mandate that the agency take a hard look when considering the cumulative impacts of a proposed action in its environmental assessment. That's in light of past, present, and reasonably foreseeable future actions. Thus, the failures of considering past permits is a violation of the Clean Water Act, as Ms. Jordan discussed, but it also violates NEPA. But what I will be focusing on will be the Corps' failure to consider reasonably foreseeable future actions. Namely, their failure to consider the applicant's reasonably foreseeable future plan to develop the rest of the Timber Branch 2 tract beyond the scope of the permit's allowance. Now, any close examination of the document will demonstrate that the Corps did not once mention, it didn't even acknowledge, the credible evidence of the applicant's reasonably foreseeable future development plan provided to the Corps. The facts are as follow. We submitted two affidavits to the Corps during the comment period, sworn testimony describing that the applicant pulled out a map, a detailed plan to extend the development of the Timber Branch 2 project to Ms. Piazza and Mr. Kirschman, the affiants. Ms. Piazza's affidavit detailed the plan of the map on there showing commercial, multi-residential, and single-family use development. It detailed a no-cut buffer border and the high density of that development. Ms. Piazza drew onto a public notice map and marked where the future development would be on the map that the applicant showed to her. And Mr. Kirschman also provided an explanation detailing what he saw on the map shown to him. Yet, the Army Corps completely ignores this evidence. It doesn't address it at all. They didn't investigate it. They didn't ask the applicant about it. They didn't even bother to say anything about it in the decision document, despite the fact that they had this evidence before them well over a year before they made their decision. Moreover, the affidavits were sent over to the applicant along with 190 pages of other comments. And the applicant also failed to mention anything at all. I guess I'm trying to understand. Your complaint is that they have to talk about it in the decision? When you say they ignored it, because I'm hearing they ignored it, they didn't consider it. But you're telling me they received it. They got it. They heard it. So when you say they ignored it, that means they didn't discuss it in the order. Yes, Your Honor. Well, there's no evidence on the record showing that they ever paid attention to it. We brought it up to them, and they needed to reason. This is a crucial issue that we continued to bring up to them. They didn't even address it. And the applicant – when you look at the decision document, they refer to the applicant's letter to address the concerns about cumulative impacts, and nothing in the applicant's letter says anything about this. This is a – instead of a 70-acre permitted tract, it's 180 to develop on the rest of it. So the Army Corps Litigation Council now offers – If they had talked about it and reached the same decision, you wouldn't be complaining. Your complaint is that they just ignored it. Yes. Well, under the data marketing partnership standard, they need to reasonably explain their decision, Your Honor. They need to go ahead and be able to provide a rational connection between the facts found and the conclusion drawn. And this was at issue here. This is something that we brought up to them. The Army Corps Litigation Council offers post hoc rationalizations explaining that they didn't address the evidence now because it was too speculative to consider. But the error doesn't come from whether or not it's too speculative or not now. The error is that they failed to reasonably explain it. And they also – the opposing counsel also heavily relies on Coliseum Square Association, Inc. v. Jackson, because there the evidence that was introduced was highly speculative, and the plaintiffs lacked, quote, concrete supporting evidence, end quote. We welcome that standard, Your Honors, because here we have provided concrete supporting evidence. If you take a look at the affidavits on page 2754 and 2766 of the appellate record, you can see. And I guess my understanding, and I may be oversimplifying it, but my understanding of the process is that they can take a preliminary look, and if they determine that they can do some kind of a truncated version of an assessment. In other words, there's some full-blown assessment evaluation that they can do, but they can take a preliminary look and say, that's not required. Based on what we view the impact is likely to be, that's not required in this case. And then they can do this abbreviated version of an assessment. Is that right? And that's what they contend they did in this case. But they never said that in the decision document. They never once said that they've taken a look. Look, we understand that there's speculation stuff. We've looked into it, and we're not going to go ahead and talk about it. It's too speculative for these reasons. And in fact, a case that they rely on under Gulf Restoration Network, they rely heavily on this case. There, the secretary acknowledged and reasonably explained why the alleged projects that were going forward were not going to be considered. And he listed specific reasons as to why it's too speculative. Here, they didn't mention it. They didn't say anything about it. They didn't say it once at all. And they didn't bring it up. And the last piece of evidence on here is that on the first page of the hydrologic analysis, the description of the project is not even for the permitted area, which is 70 acres. The project description says 180 acres for the whole track. On 2284 of the appellate record, it reads, quote, the Tibber Branch 2 subdivision is planned as a mixed-use development south of Covington on 180 acres, end quote. That's not the permitted area. That's the whole thing. That is a reasonably foreseeable future plan for development. Now, just as in the 2007 O'Reilly decision, they failed to provide a reasoned analysis. They failed to perform a cumulative impacts analysis. The analysis for this tract on this project is 20 years overdue since the 2003 permit. Thank you. This indicates you are a law student. Where are you? I'm sorry, Your Honor. This indicates that you are a law student. Yes, yes. Where? At Tulane. At Tulane Law. Well, I just graduated in May. Great. Thank you. Thank you. Good morning, Your Honors. May it please the Court. My name is Tekla Hanson-Young, and I represent the Army Corps of Engineers. I will be splitting my time, 15-5, with Mr. Reese, counsel for the interveners. The plaintiffs here say that the Corps didn't analyze the environmental impacts of the filling of these wetlands at all. But the record, in fact, shows that the Corps did look at those impacts. So the question before this Court is, was that analysis sufficient under the National Environmental Policy Act and the Clean Water Act? And under this Court's precedence in Foth and Atchafalaya Basin, the answer is yes. What the Corps did was enough. And the way that this Court can evaluate that question is by looking at the administrative record as a whole. First of all, I will talk about what the Corps did, but before I do that, I just want to note that it's important here that NEPA is a procedural statute. So it only requires the Corps to consider the environmental impacts of the project, and that's general environmental impacts. The Clean Water Act is a substantive statute that requires the Corps to ensure that the project is in the public interest and to look at a variety of factors in making that assessment. And one of those factors that it looks at is the potential cumulative impacts of the project. So the cumulative impacts analysis informs the Corps' decision that the project is in the public interest. And I'll be lumping together my discussion of what the Corps did under both and distinguishing them as necessary. To look at whether what the Corps did with respect to cumulative impacts is enough, the Corps should look at the whole record here and look at everything that it analyzed with respect to the environmental impacts of the project. And what the Corps did, and the Corps shouldn't just look at the memorandum of record, which is sort of the concise explanation of the Court's decision, but it should look at the entire administrative record, the emails going back and forth between the Corps and the project applicant, the fact that the Corps, through such discussions, got the project to narrow the scope of impacts to wetlands. All of the documents, the hydrologic analysis as well. So when the Court looks at those documents, what it would find is that the Corps considered the environmental impacts of the project, the purpose and the need of the project, the mitigation that would be incorporated into the design of the project, and the, first of all, the fact that the Corps looked at the environmental baseline, the fact that this project is in an area that's already highly developed, surrounded by other residential and commercial developments and major interstate highways. And then the Corps determined that there would be about 24 1⁄2 acres of wetlands that would be filled as a result of this project. The Corps determined that water circulation would be altered at the project site towards the dry retention pond, which would be built to ensure that after development, there would be a reduction in storm water runoff from the site. By more than 25 percent over pre-project conditions. So there's actually a reduction, after the project is built, there would be more than a 25 percent reduction in storm water runoff off the site. The hydrologic analysis also showed that this site does not take runoff from surrounding properties, so any construction on the site wouldn't affect water flowing from other properties, or block runoff, or create other flooding issues on the other properties. It's sort of a discrete site in and of itself. And the Corps also considered how the project would impact water quality. There would be no impacts to water quality because the soil at the site was not expected to contain any contaminants beyond what was normal for the area. And the fill that would be used to fill the wetlands was also not expected to contain any contaminants. And the Louisiana Department of Environmental Quality, which is responsible for ensuring water quality standards are met, certified that the project would not, in fact, affect water quality. The Corps also determined that there would be some impacts to aquatic organisms, but because they can move around, expected that the impacts would be negligible. The most important impact of the fill, of course, is the filling of the wetlands themselves. And what the Corps did here to make sure that those impacts would be the least environmentally impactful as possible under the Clean Water Act was to require the developer to purchase more than double the amount of acreage of wetlands in a compensatory mitigation bank. And so how mitigation banks work is that they restore or enhance wetlands, and then a developer who is filling wetlands comes in and buys an equivalent amount that the Army Corps determines is enough to preserve the functions of the wetlands that are being lost.  The counsel opposite is focusing on the cumulative impact, which is one of ten factors. Yes. Did the district court address the other nine? The district court did not address the other nine in its review because those weren't raised as issues in this litigation. The Army Corps considered all of the factors, though, and that is documented in its... So neither side questioned the other nine? That's correct. So this is just one of those, and we look at it whether it was arbitrary and capricious for the district court. So this court would look at whether the Army Corps' decision that the project was in the public interest is arbitrary and capricious because the cumulative impacts analysis was or wasn't sufficient under the Clean Water Act. I think that's the right framework for the court to look at the Clean Water Act claims here because the Corps is only required to look at the cumulative impacts as a part of its public interest review. That's what's been raised here as one of the factors. And for the other factors, the Corps determined that the project was in the public interest. There's a need for housing, more housing in the area. It would bring economic development, job opportunities to the area, and of course, it's privately owned property. And so the developer would then have... So it's like trying to drain a billiard table. Yes. Well, I suppose that's one way the court could look at it. I think it's important for the court to realize and note here that with respect to the lost wetlands, the functions that would be lost as a result of the filling of the 24 acres on this property will be maintained and preserved elsewhere through the purchase of 58 acres of the same kinds of... Can you focus a little bit on the reasonably foreseeable development? You've asked us to look beyond the memorandum of record in terms of what was considered by the Corps. And your opposing counsel or your friends on the other side have said that that was not considered at all. So are you saying that the email correspondence that went back and forth or whatever else was... Where is there evidence in the administrative record that that was considered? Or that you determined it was speculative but not as a post hoc decision? There is no statement in the record as far as I'm aware that the Corps specifically said, we have looked at this, at your submission with respect... Or we've looked at your allegation that the developer is going to... Has imminent plans to develop the rest of the site and we are not going to consider that because it's too speculative. But this court has not held agencies to that kind of standard in its review under the deferential arbitrary and capricious standard. What the court can do is look at the record and reasonably infer from the discussion there that the Corps determined that it didn't need to look at that project in more detail. And I would direct this court to its decision in the Gulf Restoration Network case which held that a project that had been applied for by the developer that had permits, applications submitted but had no draft environmental impact statement prepared was still too speculative to have to be considered in the agency's environmental analysis. And here what the plaintiff submitted was photos and statements saying that they had met with the owner of the property and he said he was going to develop the rest of the site. So that's far more speculative than... I think they said that at some point they described the area in terms of the overall acreage and not just the acreage that's at issue here. Yes, my friend referred to the hydrologic report which refers to a proposed development at the entire 180 acre site as opposed to the roughly 70 acres that was approved for development here. But that doesn't matter because the only application that was before the Corps was for the 70 acres and the developer could use the hydrologic analysis for its entire parcel but even in anticipation that it might in the future submit a development proposal for the entire parcel but yet those plans would still not be sufficiently concrete as a legal matter for the Corps to have to consider it here. And I would also argue that if and when that project ever becomes concrete enough where there's enough for the Corps to consider it, the Corps would also then consider any potential environmental impacts of that project and any impacts to wetlands and require sufficient compensatory mitigation under the Clean Water Act to ensure that the project would be in the public interest and that it would be minimizing environmental impacts or impacts to aquatic resources and wetlands under the Clean Water Act. Does cumulative impact imply considering adjoining lands that are not under review or only the cumulative impact of this particular tract of land? That's a good question. So what the analysis requires is for the agency to look at the incremental impact of this project when looking at past and reasonably foreseeable future projects in the area. And so the legal question is are the incremental impacts of this project significant under are they legally significant enough to require preparation of an environmental impact statement or so significant that you then have a problem under the Clean Water Act with this project no longer being in the public interest? And here what the Corps did was it looked at the potential impacts of this project and found them to be so insignificant that there would in fact be no that the incremental impact was in itself insignificant. And you can find that discussion. The Corps reached that conclusion by looking at the compensatory wetlands mitigation it was requiring to be purchased. So in other words, the only sort of big enough environmental impacts here were the filling of the 25 acres of wetlands. And then the Corps explained on page 2144 of its decision that compensatory mitigation will be required to help offset the impacts to eliminate or minimize the proposed activity's incremental contribution to cumulative effects within the geographic area. And so that's the basis for the Corps' decision that the cumulative impacts, the incremental impacts of this project would not be significant under NEPA or the Clean Water Act. So in other words, the Corps was essentially making this project have no impacts through the purchase of this compensatory mitigation. You did mention cumulative. Yes. There's a whole discussion, there's a whole section called Consideration of Cumulative Impacts. And that's under NEPA and the Clean Water Act at 2143 and 2144 of the record. And there's also a further discussion at 2138. And I also want to just emphasize for the Corps that environmental assessments, which is what the agency did here, are meant to be short, concise, detailed documents and give the agency an opportunity to look at whether the project has big environmental impacts or significant environmental impacts. And if it will, then the agency will prepare a more comprehensive analysis. On that point, the district court seemed to state that the, generally, like a 15-page document, is that correct? Or is that only in conjunction with certain types of projects? It's, environmental assessments are supposed to generally be 15 pages unless the project is extremely complex or it's sort of a rare, you know, complex project that would require a larger discussion. And those limits are still applicable. This wasn't the first rodeo in this area. That's right. And on that point, just briefly, and I see I'm out of time, but I just want to say quickly on that point, that that decision was an entirely different project. The previous O'Reilly litigation involved a project proposed by a different developer, much bigger project, different administrative record, totally different facts. And that decision was also issued before this court's decisions in Fawth and at Atchafalaya Basin, which changed what is required of the Army Corps of Engineers with respect to cumulative impacts. Unless the court has any further questions, I would ask the court to affirm the judgment of the district court. Thank you. Thank you. May it please the court, Michael Reese on behalf of the owner and the intervener. Your Honors, I'm going to skip around. I'm going to try not to regurgitate what's in the briefs. The briefs are thorough. They were well written by all sides, all three parties. I would like to concentrate on the current status of the project and discuss the prior O'Reilly decision. And Judge Douglas, I'm going to answer your question a little bit more fully on the future development of this property, those three issues. So the current status of the project, Your Honor. Just very briefly, this is a 33-month process that involved who? The O'Reilly plaintiffs, the specific party that is now complaining. They were allowed to vet, complain, be heard, and be allowed to be part of the process. And in every part of the process, the court listened, and they decided that there's no significant impact to the environmental quality in this area. So the project update is, what's the current status? Well, we have the 404 permit, and St. Tammany Parish has issued permits to proceed with the work. My client has cleared, graded, and grubbed about 1,500 feet of the right-of-way access to the property. They have cleared, graded, and grubbed the area, in this area that's approximately 120 feet wide. They specifically have started to install sewage, drainage, and initial infrastructure to the project. I'm not saying that this case is moot. I'm just saying this project is proceeding. In accordance with the St. Tammany permits and all applicable regulatory bodies, including the U.S. Army Corps of Engineers. And in fact, portions of the wetlands at issue in this matter have in fact been filled or disturbed as a result of the permitted work by all the authorities. Another thing to consider here, Your Honor, is we've talked about the dry retention pond. The dry retention pond has been increased. St. Tammany required you need to increase the dry retention pond size from 11.45 acres to 14.06 acres. So we don't just have 20%, 25% pre-development runoff reduction. We have, for 10, 25, 50, and 100-year storms, we have a reduction of some 44% to 83%. So we've gone beyond the 404 permit in terms of what is required to make this project environmentally sound for this area. The Louisiana Department of Health and Safety, the Louisiana Wildlife and Fisheries, the Louisiana Department of Environmental Quality, just to name a few, have all weighed in and said, go for it, proceed, and that's what we're doing. There's no net fill requirement. So there is a no net fill requirement of this project. All state was required to meet St. Tammany Parish's no net fill requirement, which means if any fill is added to the property, fill must be taken to another area. So don't think we're just going to add fill and then we're going to drain water off to the sides. We can't do that. We can't affect the surrounding areas, the cumulative impact that you asked about. We're net better doing this project than if we didn't do this project. And as the court knows, this leads credence to the fact that it would have, the timber branch project would have no significant impact or incremental impact to the surrounding areas, the cumulative impacts, Judge Wiener, that you asked about, as it instead would improve the prospect of flooding in the area. The prior O'Reilly case is irrelevant. As my learning counsel with the DOJ just articulated, Atchafalaya and Fath were decided in 2018 and made it very clear what the standard of review is, arbitrary and capricious, and how and why the O'Reilly case in 2007 is not Groundhog Day. The O'Reilly case in 2007 is not applicable here. We have a different owner. The prior application was for 81.54 acres with 39.54 acres of wetlands. This project impacts far less wetlands, is smaller in scope. And Judge Douglas, let me jump ahead and answer your question. Regarding the development, the future development, it requires a whole start over. New application for a 404 permit. Red light. I'm sorry, Your Honor. If you all have any questions, I'm happy to sit down. I'd ask you to affirm the judgment of the trial court. Thank you, Your Honor. Thank you, Counsel. Rebuttal. Your Honor, as most of what my learned colleague just said is outside of the record, completely outside of the record. But if we're going to talk about things that are outside of the record, what he neglected to mention is this thing they're now proceeding forward with, full speed ahead, is the entire tract, just like we said it would be. So it's kind of the elephant in the room that, you know, an odd to sort of talk about this as speculative when it's happening. But we relied, Your Honors, on the affidavits that the court had. And it's very creative for the court to say, oh, you can find this in the record. But court counsel admitted they did not discuss the development of the rest of the tract at all. It is nowhere in there. It's not just that they didn't specifically say this affidavit doesn't. They didn't address it at all. Why is it important? Judge Graves, you basically asked a question that sounded like it was getting to that. Why is it important that they didn't consider the development of the rest of the tract that's reasonably foreseeable and is in fact happening? Because if you consider the cumulative impacts of this project in light of other actions that are happening, so that's the way a cumulative impact analysis works, is what impacts will this project have when I add it to everything else happened in the past and what's going to reasonably foreseeably happen in the future? That's what you're supposed to look at and what the court did not do. It matters because the entire purpose of an environmental assessment is to determine whether the court needs to do an environmental impact statement to determine whether the impacts will be significant because that's the trigger for an EIS. And the agency cannot know whether the effects are significant, this is the whole theory behind a cumulative impacts analysis, if it is just looking at the project in isolation. That's why it's important that they didn't look at what's going to happen now when they develop the rest of the site. The court didn't look at it. So that's why it's critical to be done. And core counsel was incorrect to say that the only requirement for it to do a cumulative impacts analysis is in its public interest regulations. Wrong. It is separately in the Clean Water Act, as I cited this court earlier, and it is separately in the NEPA regs. The core's public interest regs are the third place where it appears, so that is not the lens, the only lens by which the core is supposed to look at cumulative impacts. As far as the mitigation, Your Honors, the core counsel argued, well, we're mitigating this. Again, the main concern here, and NEPA is not requiring that the core go into detail on every single impact. We understand it's supposed to be short. NEPA says in its policy statement that the core is supposed to provide detail on the significant issues, right? So however many pages it is, focus it on the significant issues. Our comments made very clear that flooding and the overall fill that's been happening in this area is the significant issue. The mitigation is 10 miles away, and there is nothing, not a single thing in the record that reflects in any way that preserving or enhancing wetlands 10 miles away is going to have any impact on filling in 24 acres of wetland and what it's going to do to flooding for the neighbors that surround it. And it's pretty obvious that something 10 miles away is not going to resolve that problem. There isn't a discussion of the Louisiana Rapid Assessment Method that existed in the Trafalgar Basin Keeper. There was a long discussion about that mitigation and how it worked. There's no discussion here. There's a chart, one chart that says it. Why do they have to do double the amount of acreage? Because the quality of the wetlands and the mitigation site of the wetlands here, which are rare, imperiled, and difficult to replace. FREDIAS, in your honors, is the case that is most analogous. It was an environmental assessment just like this was, supposed to be relatively short. The agency did not address cumulative impacts. It didn't list past permits. It was given evidence of reasonably foreseeable future impact, and it ignored it. So simply the fact that we presented that evidence, just because we put it in the record, the court has to reasonably explain that it considered it. And then once it considers it, it can then say, well, even despite development of the rest of the tract, we still don't think it's significant or not. But it didn't even get that far. Thank you, your honors. The court will take this matter under advisement. That concludes our docket, and we are adjourned. All rise.